UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------X

UNITED STATES OF AMERICA,         :

                                      :   Docket No. 22-CR-485 (SLT)

           - against -          :

                                        :   **NOTICE OF MOTION**

                                        :

CHRISTOPHER MOSCINSKI,        :

                                        :

                  Defendant.        :

---------------------------------------------------------X

PLEASE TAKE NOTICE that upon the attached Memorandum of Law, dated February 7, 2023, defendant Christopher Moscinski, by and through his undersigned attorneys, will move before Magistrate Judge Steven L. Tiscione for an order under Federal Rule of Criminal Procedure 12(b)(2) to dismiss the Information as jurisdictionally defective and for a Judgment of Acquittal under Federal Rule of Criminal Procedure 29(c)(1), as well as all other relief the Court deems just and proper under the circumstances.

DATED:        February 7, 2023

                                           Respectfully submitted,

                                         /s/ Christopher A. Ferrara
                                         Christopher A. Ferrara
                                         Special Counsel – Thomas More Society
                                         148-29 Cross Island Parkway
                                         Whitestone, Queens, NY 11357
                                         Telephone: 718-357-1040
                                         cferrara@thomasmoresociety.org
                                         *Counsel for Defendant*

                                         /s/ Dennis J. Ring
                                         Dennis J. Ring
                                         148-29 Cross Island Parkway
                                         Whitestone, Queens, NY 11357
                                         Telephone: 718-357-1040
                                         *Counsel for Defendant*

TO:    AUSA Lauren Bowman
        US Attorney's Office
        Eastern District of New York
        271-A Cadman Plaza East
        Brooklyn, NY 11201
        Via ECF

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| -against- | ) | |
| | ) | |
| **CHRISTOPHER MOSCINSKI,** | ) | Docket No. 22-CR-485  (SLT) |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT FATHER CHRISTOPHER MOSCINKSI'S MOTION FOR DISMISSAL OF THE INFORMATION UNDER FED. R. CRIM. P. 12 (b)(2) OR A JUDGMENT OF ACQUITTAL UNDER FED. R. CRIM. P. 29(c)(1)**

**TABLE OF CONTENTS**

FACTS ............................................................................................................................... 1

ARGUMENT .................................................................................................................... 2

   I.    APPLICATION OF FACE TO FATHER MOSCINSKI EXCEEDS CONGRESS'
       POWERS UNDER THE COMMERCE CLAUSE. ........................................................ 2

   II.   THERE IS NO GENERAL FEDERAL POWER TO CRIMINALIZE ALLEGED
       VIOLATIONS OF FEDERAL RIGHTS BY PRIVATE ACTORS. ................................ 11

   III.  THE GOVERNMENT'S VIEWPOINT-DISCRIMINATORY PROSECUTION OF
       FATHER MOSCINSKI MANDATES A JUDGMENT OF ACQUITTAL. ................... 12

CONCLUSION ................................................................................................................. 19

# TABLE OF AUTHORITIES

*Bond v. United States*, 572 U.S. 844, 859-60 (2014)……………………………………………..…………3

*United States v. Lopez*, 514 U.S. 549, 558-59 (1995)……………………………………………4, 5, 6, 8

*United States v. Morrison*, 529 U.S. 598, 613 (2000)……………………………………………..5, 9, 10

*United States v. Guzman*, 591 F.3d 83, 90 (2d Cir. 2010)…………………………………………………5

*Gonzales v. Raich*, 545 U.S. 1 (2005)…………………………………………………………………..6

*Jones v. United States*, 529 U.S. 848, 859 (2000)……………………………………………………..6

*Jingrong v. Chinese Anti-Cult World All. Inc.*, 16 F.4th 47, 62 (2d Cir. 2021)………………………………7

*United States v. Wilson*, 73 F.3d 675, 689 (7th Cir. 1995)…………………………………………7, 8, 9

*United States v. Bird,* 401 F.3d 633, 636 (5th Cir. 2005)…………………………………………………9

*Roe v. Wade,* 410 U.S. 113 (1973)………………………………………………………………....11

*Griswold v. Connecticut*, 381 U.S. 479 (1965)……………………………………………………11

*Dobbs v. Jackson Women's Health Org*., 213 L. Ed. 2d 545, 142 S. Ct. 2228, 2258 (2022)……..11, 15, 16

*United States v. Armstrong,* 517 U.S. 456, 464 (1996)………………………………………………12

*Matal v. Tam,* 137 S. Ct. 1744, 1766 (2017)…………………………………………………………12

*Berg v. Village of Scarsdale,* 2021 WL 5751385, at *3 (2d Cir. 2021)………………………………12

*Buzzetti v. City of New York,* 140 F.3d 134, 139-40 (2d Cir. 1998)……………………………………....13

*Wandering Dago, Inc. v. Destito,* 879 F.3d 20, 31 (2d Cir. 2018)………………………………………...13

*Hoye v. City of Oakland*, 653 F.3d 835, 854 (9th Cir. 2011)……………………………………………...13

*Brown v. City of Pittsburgh*, 586 F.3d 263, 294 (3d Cir. 2009)………………………………...13, 16, 17

*McGuire v. Reilly*, 386 F.3d 45, 65 (1st Cir. 2004)……………………………………………………17

*Cent. Radio Co. Inc. v. City of Norfolk, Va.*, 811 F.3d 625, 635 (4th Cir. 2016)…………………………17

# FACTS

On October 24, 2022, the Government filed an Information charging Father Christopher Moscinski, a Catholic priest who belongs to the religious order of the Franciscan Friars of the Renewal, with "Interference with Freedom of Access to Reproductive Health Services."   The Information alleges that on July 7, 2022, in violation of the Freedom of Access to Clinic Entrances Act, Title 18, United States Code, Sections 248(a)(1), 248(b) and 3551 *et seq.* (hereafter "FACE"), Father Moscinski "did knowingly and intentionally, by physical obstruction, intimidate and interfere with, and attempt to intimidate and interfere with, one or more persons, to wit: employees of Planned Parenthood in Hempstead, New York, because those persons were and had been providing reproductive health services and one or more other persons and a class of persons, to wit: patients of Planned Parenthood in Hempstead, New York, were and had been obtaining reproductive health services, and in order to intimidate said employees from providing, and said patients from obtaining, reproductive health services."

The only evidence adduced at the bench trial in this matter, held on January 23, 2023, was that in the process of advocating against legalized abortion Father Moscinski applied locks to the gate of the Planned Parenthood facility in Hempstead, New York, which were removed by the local fire department, and that after the locks were removed he briefly lay down in the driveway of the facility to prevent cars from entering, after which he was arrested and charged with the purely local crime of "Obstruction of Traffic" in violation of NY Penal Law § 240.20(5) and released with a desk appearance ticket.

There is no dispute that the opening of the Planned Parenthood facility for appointments at 8 AM  that day was delayed only approximately fifteen minutes and that no appointments were cancelled.  The government presented no evidence that anyone involved in interstate travel

was interfered with.  Father Moscinski's purely local, non-violent conduct had no effect whatsoever on interstate commerce. Nor did the Government present any evidence that anyone was "intimidated" by his non-violent conduct.

As further discussed in Point III, addressing the issue of viewpoint-discriminatory prosecution (a First Amendment issue distinct from the pre-trial issue of selective prosecution), at the same time Father Moscinski has been the subject of a federal FACE prosecution involving multiple FBI agents and Government attorneys, teams of FBI agents in ballistic vests, armed with long guns, have swarmed the homes of peaceful pro-life advocates based on similarly trivial alleged violations of FACE. Dozens of non-violent pro-life advocates have been subjected to FACE prosecutions during the current administration in Washington.

Meanwhile, as shown below, pro-life pregnancy centers and churches, both covered by FACE, have been subjected to an unpunished nationwide wave of violence since the leaking of the draft opinion in *Dobbs v. Jackson Women's Health Center*.  There have not been any SWAT-style raids on the homes of pro-abortion advocates engaged in these FACE violations, and there has been only one token prosecution of two women—evidently prompted by several Congressional inquiries into the blatant prosecutorial double standard that is plainly at work.  *See* Point III, *infra*.

## **ARGUMENT**

## I.    **APPLICATION OF FACE TO FATHER MOSCINSKI EXCEEDS CONGRESS' POWERS UNDER THE COMMERCE CLAUSE.**

"A motion that the court lacks jurisdiction may be made at any time while the case is pending." Fed. R. Crim. P. 12(b)(2). This Court lacks jurisdiction because Congress has no power to federally criminalize the purely local, non-violent conduct at issue here.

First of all, it is elementary that there is no general federal police power by which Congress could criminalize purely local conduct punishable under state law.  When confronted with "an improbably broad reach" of a federal criminal statute, it is appropriate to seek recourse to principles of federalism. This includes a presumption against "interpreting the statute's expansive language in a way that intrudes on the police power of the States" to reach "purely local crimes." *Bond v. United States*, 572 U.S. 844, 859-60 (2014) (internal citations omitted).

Indeed, "[f]or nearly two centuries it has been clear that, lacking a police power, Congress cannot punish [crimes or misdemeanors] generally" and that "A criminal act committed wholly within a State cannot be made an offence against the United States, unless it have some relation to the execution of a power of Congress, or to some matter within the jurisdiction of the United States." *Id.*  at 854 (internal citations and quotations omitted). Thus, it must be clear that Congress intended to reach crime of a local nature before a federal statute will be construed to criminalize such conduct. *Id.* at 860.  For the following reasons, FACE is no such statute.

Enacted in 1994, FACE reads in pertinent part as follows:

> Whoever—
>
> (1) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services [shall be subject to the penalties and civil remedies set forth in the act].

18 U.S.C. § 248(a)(1)

Unlike many other federal criminal statutes, FACE contains no express jurisdictional element. It does not predicate itself on the interstate commerce clause, as many federal laws

do, or upon any other provision of the federal constitution.  In providing the basis for federal action, such a predicate also provides for its limitations. It prevents a statute, and its application, from exceeding the powers granted to the federal government under the predicate provision of the U.S. Constitution.

Article I, section 8, clause 3 of the U.S. Constitution grants Congress the power to regulate interstate commerce. The Commerce Clause is controllingly interpreted by the Supreme Court to reach only three subjects of regulation: "the use of the channels of interstate commerce;" "the instrumentalities of interstate commerce, or persons or things [engaged] in interstate commerce, even though the threat may come only from intrastate activities;" and "activities having a substantial relation to interstate commerce . . . *i.e.*, those activities that *substantially* affect interstate commerce[.]" *United States v. Lopez*, 514 U.S. 549, 558-59 (1995) (internal citations omitted)(emphasis added).

Applying these factors, in *Lopez* the Court invalidated the federal Gun-Free School Zones Act, which attempted to make possession of a firearm in a school zone a federal crime. The Court held simply that the local activity of possession of a firearm "has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Id.* at 561.  As the Court observed: "the Court has never declared that Congress may use a relatively trivial impact on commerce as an excuse for broad general regulation of state or private activities." *Id.* 559 (internal quotation and citation omitted).

Also dispositive in *Lopez* was the factor that the Gun-Free School Zones Act "contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Id.*, 514 U.S. at 561.  FACE likewise contains no jurisdictional element that would have required the Government to prove exactly

4

what it made no effort to prove here, because it doesn't exist: a nexus to interstate commerce warranting the federal criminalization of local disorderly conduct.

Father Moscinksi's purely local, non-violent conduct did not involve the regulated channels or instrumentalities of interstate commerce.  Nor, as to the third *Lopez* favor, did his conduct "*substantially* affect" interstate commerce.  As the Supreme Court later decided, while the "substantial effect" test makes for a broad category of regulation, "thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity *only where that activity is economic in nature*.'" *United States v. Morrison*, 529 U.S. 598, 613 (2000) (quoting *Lopez*, 514 U.S. at 559-60)(emphasis added).  Accordingly, in *Morrison* the Court struck down the civil remedy provision of the federal Violence Against Women Act because "Gender-motivated crimes of violence are not, in any sense of the phrase, economic activity." *Id.*

Further, as the Second Circuit has observed, in *Morrison* "the Supreme Court again firmly rejected the proposition 'Congress may regulate noneconomic… criminal conduct based solely on that conduct's aggregate effect on interstate commerce.'" *United States v. Guzman*, 591 F.3d 83, 90 (2d Cir. 2010), as amended (Jan. 8, 2010)(quoting *Morrison*, 598 U.S. at 617).  That is, Congress may not federally criminalize petty local crimes by arguing that, in the national aggregate, they substantially affect interstate commerce.

There being no federal police power, nor any general Congressional authority to turn violations of purported federal rights into crimes, *see* Point II, *infra*, and with the "aggregation" of local crimes across the nation having been rejected in *Morrison* as a predicate for Commerce Clause jurisdiction, the only conceivable basis for federally criminalizing Father Moscinski's brief "obstruction of traffic" was that his conduct (1) was *economic* in nature, and (2) had a

*substantial effect* on interstate commerce. *Lopez*, 514 U.S. at 558-59. Neither is the case here. Father Moscinski's conduct was purely non-economic and religiously motivated; and even if a few appointments had been cancelled on the day on question—none were—his conduct still would have had no *substantial* effect on interstate commerce.

Not to the contrary is *Gonzales v. Raich*, 545 U.S. 1 (2005), wherein the Supreme Court explained that "purely local activities that are part of an ***economic*** 'class of activities' that have a substantial effect on interstate commerce" fall within the reach of Congress' Commerce Clause powers. *Id.* at 17 (citations omitted) (emphasis added). Because the growing of a product, even for local use only, is "quintessentially economic" activity, Congress could validly regulate the intrastate cultivation, possession, and use of marijuana. *Id.* at 25-26; *see also id.* at 32-33.

Also not to the contrary is *Jones v. United States*, 529 U.S. 848, 859 (2000), which involved a conviction under 18 U.S.C. § 844(i), which makes it a federal crime to "maliciously damag[e] or destro[y], ... by means of fire or an explosive, any building ... used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." The Court held that "it is appropriate to avoid *the constitutional question* that would arise were the Court to read § 844(i) to render the *traditionally local criminal conduct in which Jones engaged* a matter for federal enforcement." *Id.* at 849 (emphasis added). Instead, vacating the conviction, the Court limited the reach of the statute by interpreting it not to extend to the private home that was "owned and occupied by petitioner Jones's cousin" and was not, therefore, used in interstate or foreign commerce. *Id.* at 858-59.

With these points in view, the Second Circuit was recently presented with a Commerce Clause challenge to FACE in the civil context, which the Court likewise avoided on the grounds

6

that the alleged "interference" in violation of FACE, which also prohibits interference with religious services, 18 U.S.C. § 248(a)(2), did not involve religious but only political activity (distribution of leaflets at a public table). *Jingrong v. Chinese Anti-Cult World All. Inc.*, 16 F.4th 47, 62 (2d Cir. 2021), *cert. denied*, 214 L. Ed. 2d 17, 143 S. Ct. 90 (2022), and *cert. denied*, 214 L. Ed. 2d 17, 143 S. Ct. 91 (2022).  The concurring opinion by Judge Walker, however, squarely confronts the issue presented here:

> In prohibiting violence against worshippers at places of religious worship, FACEA (sic) regulates *local, non-economic conduct that has at best a tenuous connection to interstate commerce*. The Supreme Court in *United States v. Lopez* and *United States v. Morrison* expressly rejected the notion that the commerce power reaches "noneconomic, violent criminal conduct" of the sort proscribed here "based solely on that conduct's aggregate effect on interstate commerce." I therefore would reach and sustain the Commerce Clause challenge to the religious exercise provision of FACEA, 18 U.S.C. § 248(a)(2), and would reverse the district court's denial of summary judgment to defendants.

*Id.* at 63-64 (Walker, J., concurring)

While Judge Walker's concurrence distinguished places of religious worship from abortion clinics, noting that Congress had made "specific interstate commerce findings" as to the latter but not the former, *id.* at 66, the mere existence of those findings does not insulate §248(a)(1), covering abortion clinics, from a Commerce Clause challenge.

Here the dissenting opinion of Judge Coffey in *United States v. Wilson*, 73 F.3d 675, 689 (7th Cir. 1995) is instructive.  While the Seventh Circuit rejected a Commerce Clause challenge to §248(a)(1), reversing the well-reasoned decision of the District Court, *United States v. Wilson,* 880 F.Supp. 621 (E.D.Wis.1995), Judge Coffey observed—even before the Supreme Court's decision in *Morrison*—that *Lopez* means that "there are only two types of valid federal regulation under the 'substantial effects' test: First, 'a wide variety of congressional Acts regulating intrastate economic activity where we have concluded that the activity substantially

7

affected interstate commerce,' 514 U.S. at ——, 115 S.Ct. at 1630 (emphasis added); and second, criminal statutes that include a 'jurisdictional element which would ensure, through case-by-case inquiry, that the [prohibited act] in question affects interstate commerce.'" *Wilson*, 73 F.3d 691(Coffey, J., dissenting).

As already shown, neither is the case here. Nor can §248(a)(1) be saved by rote Congressional "findings" of an effect on interstate commerce from purely local, non-violent conduct of the sort involved in this case. As Judge Coffey noted, citing *Lopez*: "The United States Supreme Court, interpreting congressional legislation, recently reaffirmed that 'simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so.'" *Id.* at 692; quoting *Lopez,* 514 U.S. at —— n. 2, 115 S.Ct. at 1629 n. 2 (Rehnquist, J., concurring in judgment).

To be sure, Congress did make the rote recital that FACE is warranted by the Congressional commerce power in that abortion clinics operate in the "stream of commerce" because they "purchase medicine, medical products, surgical instruments and other necessary medical products, often from other States; they employ staff; they own or lease office space." S.Rep. No. 103–117, 103rd Cong., 1st Sess. at 31 (1993). Congress also declared that "certain individuals travel between states not only to obtain but also to provide abortion services" and that *violence* at abortion clinics (not fleeting "obstruction of traffic" by a priest) "results in the provision of fewer abortions and less interstate movement of people and goods." *Id. See* H.R. 103–306, 103rd Cong., at 8–9 (1994) reprinted in 1994 U.S.C.C.A.N. 699, 706.

But, as Judge Coffey sagely observed, while these Congressional "findings" are nominally "rational" under the rational basis test for assessing Congressional legislation not subject to strict scrutiny, they nevertheless amount to "nothing but a rational description of a

generalized class of activities, and is far removed from a justification for the exercise of the commerce power. Like the district court, I am hard-pressed to posit any activity that would not be covered by such an all-inclusive description." *Wilson*, 73 F. 3d at 696.  That is exactly Father Moscinski's position here.

Equally instructive, and further indicative of what should ultimately be the fate of the FACE Act, is the dissent by Judge DeMoss from the Fifth Circuit's rejection of a Commerce Clause challenge to FACE in the post-*Morrison* case of *United States v. Bird,* 401 F.3d 633, 636 (5th Cir. 2005); *cert. den. Bird v. U.S*., 546 U.S. 864 ("*Bird II*").

In *Bird II*, the Fifth Circuit summarily dismissed the claim, accepted by the District Court, that under *Morrison* "passage of [the FACE Act] was beyond Congress' Commerce Clause authority." *U.S. v. Bird*, 79 F.Supp.2d 827, S.D.Tex., Aug. 18, 2003; *order Vacated by U.S. v. Bird* 401 F.3d 633, 5th Cir.(Tex.). In reversing the District Court, the Fifth Circuit's one-page opinion merely states: "We do not find that the Supreme Court's decision in *Morrison* materially affects our holding in *Bird I* [remanding the case for trial pre-*Morrison*]. Our decision in that case is therefore binding." *Id.* at 634.

Citing his own dissent in *Bird I*, which looked to the *Lopez* decision, Judge DeMoss observed that "the holding in *Morrison* dictates even more clearly that Congress exceeded its Commerce Clause authority when it enacted FACE…". *Bird* II, 401 F.3d at 635 (DeMoss, J., dissenting). Confronting the same constitutional issue the Supreme Court avoided by a narrowing construction of the federal anti-arson statute in *Jones*, Judge DeMoss wrote:

> Then, in Morrison, the Supreme Court again was faced with a federal statute, the Violence Against Women Act ("VAWA")… that sought to regulate criminal activity, this time in the form of gender-motivated violence. The Court first observed that "a fair reading of *Lopez* shows that the *noneconomic, criminal* nature of the conduct at issue was central to our decision in that case." 529 U.S. at 610, 120 S.Ct. 1740

>The *Morrison* Court further explicated that requiring the regulation to be of an *economic* activity is essential to the limitations set forth in the Commerce Clause, noting that "*Lopez's* review of Commerce Clause case law demonstrates that in those cases where we have sustained federal regulation of intrastate activity based upon the activity's substantial effects on interstate commerce, *the activity in question has been some sort of economic endeavor.*" Id. at 611, 120 S.Ct. 1740 (emphasis added) (citing Lopez, 514 U.S. at 559-60, 115 S.Ct. 1624). Using the lack of an economic element in the activity being regulated as partial justification, the Court subsequently struck down VAWA as an impermissible exercise of Congress's Commerce Clause. *Morrison*, 529 U.S. at 617-18, 120 S.Ct. 1740.

*Id.* at 635 (first emphasis in original)

Tellingly, *Bird II* involved the *violent* non-economic criminal activity of driving a van through the door a Planned Parenthood facility in Houston. *Id.* at 634. But even as to violent criminal activity, as the Court in *Morrison* observed: "The regulation and punishment of intrastate *violence* that is not directed at the instrumentalities, channels, or goods involved in interstate commerce *has always been the province of the States*. Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *Morrison*, 529 U.S. at 618 (internal citation omitted)(emphasis added).

All the more does Congress exceed its authority when, as in this case, a federal statute is employed to transform into a federal crime local, non-violent conduct that indisputably had absolutely no effect on interstate commerce and warranted nothing more than a desk appearance ticket for "obstruction of traffic."

Therefore, at least as applied to Father Moscinski, FACE is an unconstitutional overreach of Congress' power to regulate *interstate commerce*, not *local crimes*—particularly non-violent disorderly conduct. The conviction must be vacated, and the Information dismissed for lack of jurisdiction.

## II.  THERE IS NO GENERAL FEDERAL POWER TO CRIMINALIZE ALLEGED VIOLATIONS OF FEDERAL RIGHTS BY PRIVATE ACTORS.

The Government may argue that, the Commerce Clause aside, FACE is a valid exercise of Congress' supposed "inherent power" to pass laws that protect the exercise of fundamental rights, including the right to an abortion recognized by the Supreme Court in *Roe v. Wade,* 410 U.S. 113 (1973) or the right to contraception the Court recognized in *Griswold v. Connecticut*, 381 U.S. 479 (1965).  Of course, as the Supreme Court's decision in *Dobbs v. Jackson Women's Health Org*., 213 L. Ed. 2d 545, 142 S. Ct. 2228, 2258 (2022) finally makes clear, the Constitution simply "does not confer" any right to abortion.  Rather, "the authority to regulate abortion [was] returned to the people and their elected representatives…" *Id.* at 2279, 213 L. Ed. 2d 545. Therefore, FACE lacks even an arguable in predicate in this non-existent right.

But even if FACE were to be defended based on a putative federal right to contraception, counsel is aware of no authority for the proposition that Congress has some sort of free-floating "inherent power" to criminalize any activity by local *private actors* that allegedly impairs the exercise of fundamental rights.  Nor did Congress cite any such power in enacting FACE.  It merely alluded to FACE being analogous—but not equivalent —to the civil rights laws of the Sixties. *See* S. REP. 103-117, 21 ("These circumstances closely parallel those that led to the enactment of the civil rights laws on which S. 636 [FACE] is modeled.")

In fact, Congress declared only that "Congress has two independent sources of constitutional authority to enact the Freedom of Access to Clinic Entrances Act: *the Commerce Clause* of Article I, section 8, clause 3 of the Constitution, and section 5 of the Fourteenth Amendment."  *Id.* at 30 (emphasis added). But section 5 of the Fourteenth Amendment, its enforcement clause, regards only *state action* that infringes on "the privileges or immunities of citizens of the United States", that "deprive[s] any person of life, liberty, or property, without

11

due process of law", or that "denies to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, section 1.[1]

Therefore, the Congressional power to enact FACE depends solely on whether FACE exceeds Congressional authority under the Commerce Clause. And that it does.

## III.   THE GOVERNMENT'S VIEWPOINT-DISCRIMINATORY PROSECUTION OF FATHER MOSCINSKI MANDATES A JUDGMENT OF ACQUITTAL.

Additionally, FACE is unconstitutional as applied to Father Moscinksi. "Although prosecutors enjoy wide discretion," they violate the guarantee against viewpoint discriminatory enforcement by "prosecut[ing] based on a defendant's 'race, religion, or other arbitrary classification.'" *United States v. Armstrong,* 517 U.S. 456, 464 (1996)). Moreover, the Government may not act based on its "disapproval of a subset of messages it finds offensive," as "[t]his is the essence of viewpoint discrimination." *Matal v. Tam,* 137 S. Ct. 1744, 1766 (2017) (Kennedy, J., concurring).

As opposed to selective prosecution, which must be raised before trial, *see* Fed. R. Crim. P. 12 (b)(3)(A)(iv), viewpoint-discriminatory prosecution, which is being raised here, is a First Amendment issue properly the subject of a post-conviction motion under Rule 29. "Although there can be overlap between a 'viewpoint discrimination' claim under the First Amendment and a 'selective enforcement' claim under the Equal Protection Clause of the Fourteenth Amendment" (or the Fifth Amendment), they are distinct violations." *Berg v. Village of Scarsdale,* 2021 WL 5751385, at *3 (2d Cir. 2021).

---

[1] Not to the contrary is 18 U.S.C. § 241, which reaches conspiracies to "injure, oppress, threaten or intimidate any person in any State... in the free exercise or enjoyment of any right of privilege secured to him by the Constitution or laws of the United States..." The Government alleged no such conspiracy in this case as Father Moscinski acted alone.

The First Amendment prohibits viewpoint discriminatory enforcement of a law where the Government has engaged in "a pattern of unlawful favoritism." *Thomas v. Chi. Park Dist,* 534 U.S. 316, 325 (2002)). Viewpoint discriminatory law enforcement "is an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.'" *Buzzetti v. City of New York*, 140 F.3d 134, 139-40 (2d Cir. 1998) (quoting *Rosenberger v. Rector and Visitors of the Univ. of Virginia*, 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995)). "The government discriminates against viewpoints when it disfavors certain speech because of 'the specific motivating ideology or the opinion or perspective of the speaker.'" *Wandering Dago, Inc. v. Destito,* 879 F.3d 20, 31 (2d Cir. 2018) (quoting *Rosenberger*, 515 U.S. at 829, 115 S.Ct. 2510).

The guiding principle here is that "Courts must be willing to entertain the possibility that content-neutral enactments are enforced in a content-discriminatory manner. If they were not, the First Amendment's guarantees would risk becoming an empty formality, as government could enact regulations on speech written in a content-neutral manner so as to withstand judicial scrutiny, but then proceed to ignore the regulations' content-neutral terms by adopting a content-discriminatory enforcement policy." *Hoye v. City of Oakland*, 653 F.3d 835, 854 (9th Cir. 2011).

Where, as here, "a plaintiff whose evidence consists solely of the incidents of enforcement themselves" makes a claim of viewpoint discriminatory enforcement, he "must establish a pattern of enforcement activity evincing a governmental policy or custom of intentional discrimination on the basis of viewpoint or content." *Brown v. City of Pittsburgh*, 586

13

F.3d 263, 294 (3d Cir. 2009).  That is this case.  While  FACE supposedly protects both pro-choice and pro-life "reproductive health services," 18 U.S.C. § 248(a)(2) and (e)(5), this Court may judicially notice[2] the indisputable evidence that the Government, under  the Biden Administration, has engaged in an overt pattern of aggressive enforcement of FACE against pro-life individuals for the most trivial alleged offenses, including Father Moscinski's "obstruction of traffic," while turning a blind eye to acts of *violence and destruction* by pro-abortion individuals—even when pregnancy centers and churches have been *firebombed* and vandalized at far greater rates in the past year, including in the State of New York,[3] since leaking of the draft opinion in *Dobbs.*

In 2022 alone, the Government has engaged in seven enforcements of FACE against a total of 26 individuals, all of whom are pro-life activists, including Father Moscinski.[4] This number is dramatically higher than FACE prosecutions in recent years, which included only four individuals in 2021, one in 2020, two in 2019, one in 2018, and less than one per year on average (9 in all) between 2011 and 2017.[5] Glaringly, with the exception of one token prosecution of two people commenced only days ago[6]—doubtless motivated by the public outcry over the Government's blatant double standard of FACE enforcement—the Government has thus far

---

[2] *See* Fed. R. Evid. 201(b)(1),(2)("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.")
[3] *See e.g.*  Joe Burkaras, "Pregnancy clinic [in Buffalo, NY] firebombed in 'Jane's Revenge' attack sues police for surveillance footage", CNA, September 21, 2022,
https://www.catholicnewsagency.com/news/252352/pregnancy-clinic-firebombed-janes-revenge-no-arrests ("Harden said that he has asked both the FBI and local police for access to the footage so he can make a copy of it, to no avail.")
[4]  U.S.D.O.J., Civil Rights Division, "Recent Cases on Violence Against Reproductive Health Care Providers," https://www.justice.gov/crt/recent-cases-violence-against-reproductive-health-care-providers
5 *Id.*
[6] USDOJ Press Release: "Two Defendants Indicted for Civil Rights Conspiracy and FACE Act Offenses Targeting Pregnancy Resource Centers,"  https://www.justice.gov/opa/pr/two-defendants-indicted-civil-rights-conspiracy-and-face-act-offenses-targeting-pregnancy-0

categorically refrained from enforcing FACE against *any* physical damage or destruction caused to no less than *98 Catholic churches* and *74 pregnancy resource centers* since the May 2022 leak of the draft opinion in *Dobbs*.[7]

Further, as two Congressman recently pointed out in a letter of inquiry to DOJ,[8] when it comes to the pro-abortion advocates committing violent acts against pro-life pregnancy centers and churches supposedly protected by FACE, §248(a)(2), there is no evidence of any over-the-top FBI raids by 20 agents armed with ballistic shields and long guns (or any arrests at all, for that matter), as was seen in the case of pro-life advocate Mark Houck, who is also represented by attorneys for the Thomas More Society. The Government's flimsy prosecution under FACE ended with an acquittal by a Philadelphia jury on both counts after *one hour* of deliberation.[9]

Similarly, two weeks after the raid on Mr. Houck's home, the FBI raided the home of Paul Vaughn, yet another non-violent pro-life advocate represented by the Thomas More Society. The father of eleven was dragged from his home by armed FBI agents in the presence of his terrified children. His "offense" was to sit in the hallway outside an abortion

---

[7] Mary Margaret Olahan, "DOJ's Kristen Clarke: A Pro-Abortion Activist Enforcing the Law Against Pro-Lifers," The Daily Signal, October 26, 2022, https://www.dailysignal.com/2022/10/26/dojs-kristen-clarke-pro-abortion-activist-enforcing-law-pro-lifers/ *See also* "The Attacks on Crisis-Pregnancy Centers, June 20, 2022, *Wall Street Journal*, https://www.wsj.com/articles/the-attacks-on-crisis-pregnancy-centers-janes-revenge-abortion-roe-v-wade-violence-destroyed-11655653644

[8] Mary Margaret Olohan, "EXCLUSIVE: Jim Jordan Launches Congressional Inquiry Into FBI Raid on Mark Houck, DOJ's Political Enforcement of FACE Act," Daily Signal, Oct. 7, 2022, https://www.dailysignal.com/2022/10/07/exclusive-jim-jordan-launches-congressional-inquiry-into-fbi-raid-on-mark-houck-dojs-political-enforcement-of-face-act/

[9] "Prominent Bucks County antiabortion activist not guilty of charges in altercation with Planned Parenthood volunteer," Jeremy Roebuck, *Philadelphia Inquirer*, January 30, 2023 ("It took a jury one hour to find Mark Houck, 49, not guilty of violating the FACE Act."), https://www.inquirer.com/news/mark-houck-bucks-county-planned-parenthood-jury-acquitted-20230130.html

clinic while singing hymns and praying.[10]  These preposterous shows of force over trivial alleged offenses have prompted a Congressional investigation of the current administration's patently viewpoint-discriminatory FACE enforcement.[11]

Finally, the viewpoint-discriminatory prosecutorial policy of the current administration was explicitly confirmed on July 8, 2022. As part of an overall response to the published opinion in *Dobbs,* President Biden declared: "I'm asking the Justice Department ... to do … everything in their power to protect these women seeking to invoke their right" to abortion; and "(i]n states where clinics are still open, to protect them from intimidation."[12] While not dispositive, these sorts of "contemporaneous statements" by relevant decisionmakers like President Biden, especially while failing to take any comparably vigorous action in response to the phenomenon of nationwide pro-abortion violence against pregnancy centers and churches since the *Dobbs* leak, are only more evidence of discriminatory intent.

In short, the record of FACE enforcement during the current administration shows precisely "a pattern of enforcement activity evincing a governmental policy or custom of intentional discrimination." *Brown,* 586 F.3d at 293-94; *see also Thomas,* 534 U.S. at 325 ("Granting waivers to favored speakers ...  would of course be unconstitutional."). Certainly, the Government's recent enforcement of FACE has fallen far "more heavily on those who advocate … a pro-life view," even though the indisputable evidence confirms that "advocates

---

[10] *See* Thomas More Society Press Release, https://thomasmoresociety.org/thomas-more-society-defending-latest-fbi-pro-life-victim-hymn-singing-father-of-eleven/

[11] Joe Burkaras, "Legislators Raise Concerns About FBI Raid at Pro-Life Catholic Mark Houck's Home", September 28, 2023, National Catholic Register, https://www.ncregister.com/cna/legislators-raise-concerns-about-fbi-raid-at-pro-life-catholic-mark-houck-s-home

[12] The White House, "Remarks by President Biden on Protecting Access to Reproductive Health Care Services," https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/07/08/remarks-by-president-biden-on-protecting-access-to-reproductive-health-care-services/

of a [pro-life] viewpoint" do *not* "happen to engage in certain proscribed conduct more than those who espouse other views." *Brown*, 586 F. 3d 263.  While that disparate impact alone is not sufficient, it does support an inference of intentional discrimination in violation of the First Amendment. *Id.*  Father Moscinski's case is easily distinguished from cases where defendants or claimants pointed to no actual "evidence that the police turned a blind eye toward pro-abortion speech while not turning a blind eye to possible transgressions by plaintiffs." *McGuire v. Reilly*, 386 F.3d 45, 65 (1st Cir. 2004)

The evidence here is well within the Village of Arlington Heights factors that courts often find "probative in determining discriminatory intent." *Cent. Radio Co. Inc. v. City of Norfolk, Va.*, 811 F.3d 625, 635 (4th Cir. 2016) (citing *Vill. of Arlington Heights v. Metro. Haus. Dev. Corp.*, 429 U.S. 252, 266-68 (1977)).  Specifically, it shows a "consistent pattern" of actions "disparately impacting members of a particular class of persons," as well as "significant departures from normal procedures." *Cent. Radio*, 811 F.3d at 635 (internal quotations and citations omitted).  For example, the over-the-top, armed-to-the-teeth raid on Mr. Houck's home—after attorneys for the Thomas More Society offered to voluntarily surrender him on the flimsy charges for which he was promptly acquitted[13]—and the similar raid on Mr. Vaughn's home.

---

[13] *See* Thomas More Society press release, "Thomas More Society Defending Pro-Life Family Man Arrested in Dawn Raid by Heavily Armed FBI, September 26, 2022." ("Rather than accepting Mark Houck's offer to appear voluntarily, the Biden Department of Justice chose to make a show of potentially deadly force, sending twenty heavily armed federal agents to the Houck residence at dawn this past Friday," explained [Peter] Breen [Thomas More Society Senior Counsel]. "In threatening form, after nearly breaking down the family's front door, at least five agents pointed guns at Mark and arrested him in front of his wife and seven young children, who were terrified that their husband and father would be shot dead before their eyes."https://thomasmoresociety.org/thomas-more-society-defending-pro-life-family-man-arrested-in-dawn-raid-by-heavily-armed-fbi/

Indeed, one former high-ranking DOJ official recently stated (anonymously) that Mr. Houck's prosecution is "atypical" from previous FACE prosecutions which usually "involve things like blowing up an abortion clinic, or threatening to blow up a clinic, serious violence or threats to bodily injury," not "something of th[e] nature that is alleged in the Houck case."[14] And in a letter of inquiry to the FBI, 12 Senators recently noted that the unusually aggressive nature of Mr. Houck's arrest appeared to violate DOJ's own use-of-force policy.[15]

Clearly, this administration is employing totally unnecessary and potentially deadly raids on non-violent alleged offenders—obviously "significant departures from normal procedures"—to placate its pro-abortion constituency, which is enraged over the *Dobbs* decision. That rage is reflected in the "doxing" of Justices Alito, Barrett, Gorsuch and Kavanaugh and the unprecedented massing of demonstrators in front of the Justices' homes to curse, revile and intimidate them in violation of 18 U.S.C. § 1507, which prohibits, as an extortionate practice, picketing or parading in front of a judge's home "with the intent of interfering with, obstructing, or impeding the administration of justice, or with the intent of influencing any judge." This still-ongoing extortion, which the Department of Justice has refused to prosecute, was allowed to escalate with the attempted assassination of Supreme Court Justice Brett Kavanaugh at his home on June 8, 2022, for which the perpetrator was indicted for attempted murder.[16] Thus, the slightest "interference" with or "intimidation" of "abortion providers" is met with SWAT-style FBI raids and federal prosecutions while the incessant intimidation of Supreme Court Justices in violation of federal law is ignored.

---

[14] Olahan, *supra*, note 7.

[15] Brianna Herlihy, "12 GOP senators demand explanation for FBI arrest of pro-life activist," Fox News, Sept. 28, 2022, https://www.foxnews.com/politics/12-gop-senators-demand-explanation-fbi-arrest-pro-life-activist

[16] *See* Nicholas Roske arrested with weapon near Brett Kavanaugh's home (nypost.com)

For all these reasons, the Government's enforcement of FACE against Father Moscinski is manifestly viewpoint-discriminatory, the Information must be dismissed, and a judgment of acquittal entered pursuant to Rule 29(c)(1).

## **CONCLUSION**

The Information should be dismissed pursuant to Fed. R. Crim. P. 12 (b)(2) or a judgment of acquittal entered pursuant to Fed. R. Civ. P. 29(c)(1).

Dated: February 7, 2023

Respectfully submitted,

/s/ Christopher A. Ferrara
Christopher A. Ferrara
Special Counsel – Thomas More Society
148-29 Cross Island Parkway
Whitestone, Queens, NY 11357
Telephone: 718-357-1040
cferrara@thomasmoresociety.org
*Counsel for Defendant*

/s/ Dennis J. Ring
Dennis J. Ring
148-29 Cross Island Parkway
Whitestone, Queens, NY 11357
Telephone: 718-357-1040
dennisringlaw@gmail.com
*Counsel for Defendant*